**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

MABELLE DE LA ROSA DANN,
    *Defendant-Appellant.*

No. 10-10191

D.C. No.
08-390-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
May 9, 2011—San Francisco, California

Filed July 22, 2011

Before: Betty B. Fletcher and Sidney R. Thomas,
Circuit Judges, and Nancy Gertner, District Judge.*

Opinion by Judge Gertner

---

*The Honorable Nancy Gertner, United States District Judge for the District of Massachusetts, sitting by designation.

## COUNSEL

Barry J. Portman, Federal Public Defender, and Jerome E. Matthews, Assistant Federal Public Defender, Oakland,California, for the defendant-appellant.

Thomas E. Perez, Assistant Attorney General, Civil Rights Division Melinda Haag, United States Attorney, Barbara J. Valliere, Chief, Appellate Section, and Assistant United

States Attorney, Merry Jean Chan, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

---

**OPINION**

GERTNER, District Judge:

Mabelle de la Rosa Dann ("Dann") was charged with conspiracy to commit visa fraud (count one), visa fraud (count two), forced labor (count three), unlawful conduct regarding documents in furtherance of servitude (count four),[1] and harboring an illegal alien for the purpose of private financial gain (count five). All charges arose out of conduct involving her live-in nanny and housekeeper, Zoraida Peña Canal ("Peña Canal").

Dann, an American citizen of Peruvian descent, arranged for Peña Canal to travel from her native Peru to the United States in 2006 and enter under a fraudulently-obtained visa to serve as a nanny and housekeeper. Dann was going through a divorce at the time, was unemployed, and was not receiving child support. Once Peña Canal arrived, Dann kept her passport, forbade her from speaking with anyone outside the home, and failed to pay her for two years, although she often promised that she would. She repeatedly threatened to send Peña Canal back to Peru; and yet when Peña Canal agreed to go home, Dann told her that she would owe her $8,000 because she had only worked off $7,000 of the $15,000 worth of "expenses" that Dann had paid on her behalf. Dann eventually asked Peña Canal to sign a false statement that she had been paid minimum wage. This statement, along with Peña Canal's passport and Peruvian identification, were later found by U.S. Immigration and Customs Enforcement ("ICE") agents underneath clothes in a drawer in Dann's room.

---

[1] The parties refer to this charge as "document servitude."

Dann was convicted after a jury trial on all five counts and sentenced to 60 months' imprisonment. The district court ordered that she pay restitution to Peña Canal of $123,740.34. And because the court found that Peña Canal (who was living in a shelter) needed money immediately, the court ordered Dann to turn over any accrued child support payments that she received from her ex-husband while incarcerated directly to Peña Canal. Dann's children were eligible for child support. Her eldest son is now sixteen, and her twins are ten years old.

Dann appeals her convictions for forced labor as well as for the related offenses of document servitude and harboring an alien for financial gain. She also appeals three sentencing enhancements under the United States Sentencing Guidelines ("U.S.S.G.") and the district court's restitution order.

As we explain below, we affirm the convictions on all counts as supported by sufficient evidence. With respect to sentencing, we decline to reach the merits of the first enhancement for visa fraud because it does not affect the guidelines offense level; we affirm the second enhancement for holding Dann in forced labor for over one year; and we affirm the third enhancement for committing a felony "in connection with" forced labor.

Finally, we reverse the district court's restitution order. This case raises a question of first impression: whether child support arrearages belong to a criminal defendant such that they may be assigned to a victim by a restitution order while the defendant's children are still minors. Upon review of California case law, we conclude that the minor child is the real party in interest to accrued child support. Until the child reaches the age of majority, the parent remains a conduit of the support and may distribute it for his benefit. Thus, any money that Dann receives for child support does not belong to her but rather to her children; it cannot be assigned to Peña Canal.

## BACKGROUND

### I. Factual Background

The parties at trial and on appeal present two competing narratives. Dann contends that this case is a not unusual story of the relationship between two women, with all its ups and downs. As a divorced, single mother with three small children, Dann was desperate. She gave Peña Canal the opportunity to come to the United States, and she treated her as a family member. Dann took care of, housed, and fed Peña Canal, and wanted to pay her as soon as she had the chance. Dann hoped to give Peña Canal a room of her own but was unable to do so. The two women had their fights, as all family members do. After Peña Canal left Dann, she discovered that she could obtain a T-Visa and stay in the United States, as long as she testified against Dann.[2] Peña Canal's testimony is tainted by her incentive to lie.

The government in turn portrays a woman who went to great lengths to violate immigration laws so that Peña Canal could work for her. She needed cheap — or free — labor, and this was her means of procuring it. Her behavior towards Peña Canal became worse and worse over time, culminating in Peña Canal's working without pay in slave-like conditions, fearful of what would happen if she were to leave.

Since Dann was convicted, however, the two narratives are not on equal footing. The Court is to construe all facts in favor of the verdict. The facts below are therefore presented in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

---

[2]For a T-Visa to be issued pursuant to 8 U.S.C. § 1101(a)(15)(T)(i)(I), agents or prosecutors have to submit a letter to Immigration Services certifying that the visa applicant has been the victim of a "severe form of trafficking in persons," and the visa applicant must also cooperate in the prosecution of the trafficker.

### 1. Dann Brings Peña Canal to the United States

Dann is a naturalized American citizen of Peruvian descent who graduated from U.C. Berkeley's Business School. She first met Peña Canal during a brief visit to Peru in March of 2002, when Peña Canal was working as a nanny for Dann's sister. Dann suggested that Peña Canal come to the United States to nanny for her family instead.

Dann returned to Peru a few months later and hired Peña Canal to take care of her twin baby boys during the trip. Again she spoke of taking Peña Canal to the United States. She promised Peña Canal the opportunity to study English and a salary that would increase from $300 to $600 per month. At trial, Peña Canal testified that even at that time, Dann spoke about deductions, calculations, and costs, such as the cost of a visa and the cost of housing in the United States.

Dann and Peña Canal went about the process of applying for a visa. Dann filled out the papers for Peña Canal and told her to pretend that she was a tourist going to the United States for vacation. Dann told her that it would be more believable if Peña Canal said that she had a daughter in Peru or a mother who was sick, and so on her first application, Peña Canal stated that she had a four-year-old daughter and presented a false birth certificate as proof. That application was denied.

Dann filled out a second application, this time stating that she and Peña Canal, along with the twins, would go to the United States for Thanksgiving and then return. This time Peña Canal was granted an interview at the U.S. Consulate, but this application was also denied. Dann returned to the United States in November of 2002 but vowed to send for Peña Canal, even if it meant smuggling her with "coyotes" through Mexico.

During the following two years, Dann tried to help Peña Canal come to the United States on three occasions. Dann was going through a divorce, and in 2004 she wrote to Peña Canal:

Dear Zoraida,

I hope you are well. Here, I'm trying to do every-thing possible to get ahead all alone and with the responsibility of three children. As you probably know, my divorce will be finalized very soon. Now, the judge has ordered that I must go out and work. And I need more help than ever . . . I'm going to try and see how to bring you over here. As you probably know, a man that my brother is acquainted with is going to get in touch with you very soon and will try to bring you. Don't tell anyone from your family . . . .

Finally, in December 2004, Dann arranged for Peña Canal to contact Dann's friend, Silvana de la Rosa ("Silvana"). Dann and Silvana entered into a contract to bring Peña Canal to the United States. Silvana would pretend that she was so frail from cancer that she needed an assistant, Peña Canal, to travel with her. Dann hired a consultant to teach Peña Canal how to lie to immigration officials, with whom Peña Canal met regularly over a period of several months before her inter-view at the consulate. Peña Canal was granted a tourist visa and entered the United States on July 27, 2006.

At this point, Dann was unemployed and receiving no child support. She and her three children were living with her mother.

### 2.   Work Conditions with Dann

When Peña Canal arrived in the United States, she moved in with Dann and Dann's three boys at Dann's mother's house. The house was cramped, and Peña Canal slept on the floor. Dann promised that they would be there for only a few days, and then they would move to a bigger apartment where they would have more privacy. Around this time, Dann took Peña Canal's passport for safe-keeping, since Peña Canal did

not have any private or secure space of her own. When Silvana left the country, Dann tore up Peña Canal's return ticket to Peru along with the contract to bring Peña Canal to the United States.

Eventually, in late September of 2006, Dann, her three children, and Peña Canal moved out of Dann's mother's house and into a two-bedroom apartment. Here again, Peña Canal did not have a room of her own. She slept on the floor in the corner of the living room. Dann began working as a real estate agent but funds were tight. She promised Peña Canal that she would pay her as soon as she got on her feet. Dann, however, never paid Peña Canal.

Peña Canal's workday began at 6:00 a.m. when she made breakfast for Dann and the boys. Once the boys were off to school, she had until noon to clean the apartment, do laundry and ironing, and prepare lunch. At about 12:30 p.m., she walked thirty minutes to the twins' school to pick them up. She would feed them lunch and then supervise their homework until the elder son came home. She would take the children out to play, feed them dinner at 6:00 p.m., and then get them ready for bed at 8:00 p.m. After the children were asleep, she would tidy the house before retiring at about 10:00 p.m.

The conditions — and the relationship — worsened over time. In January of 2007, Dann forbade Peña Canal from leaving the apartment without permission. When Dann's friends came over, she made Peña Canal hide in the gym of the apartment complex. She told Peña Canal not to talk to anyone because she did not want Peña Canal to tell "anybody about the things here at home." At trial, the property manager of Dann's apartment complex testified that Dann told him to order Spanish-speaking personnel not to speak with Peña Canal.

Sometime in the winter of 2007, Dann began restricting Peña Canal's food intake. Dann forbade Peña Canal from eat-

ing fruit or drinking tea without permission. Eventually, Dann began weighing the meat and counting eggs and bread to make sure Peña Canal was not eating more than her ration.

By February 2007 — seven months after Peña Canal's arrival in the United States — Dann still had not paid Peña Canal. At that time, Dann told Peña Canal:

> You shouldn't — you shouldn't think that I'm treating you like a slave, you shouldn't think that I'm treating you like a slave. I'm going to pay you. I don't want for you to leave me because I don't know what would happen to my children. Where would I keep them? The government would take them from me.

Dann continued to promise to pay Peña Canal. In March of 2007, she opened a bank account for Peña Canal (falsely informing the bank that Peña Canal worked for Whole Foods). Dann kept the bank documents; the personal checks issued to the account were later found in her possession.

In January 2008, the two women had a heated argument because Dann thought that Peña Canal had spoken to her son's trombone teacher without permission. Dann said, "I told you not to talk to anybody. Why did you go and talk to the teacher? Did you want to practice your English?" She threatened to send Peña Canal back to Peru. She said, "I'm giving you a chance to be here in this country. I'm going to buy your ticket right now. But first, I'm going to figure out our accounts." Dann concluded that Peña Canal owed a total of $15,000, of which she had worked off only $7,000.

Dann falsely accused Peña Canal of stealing from her on at least four occasions. The last of these, on March 1, 2008, resulted in another argument. This time, Peña Canal stood up to Dann and said,

> You know what? If I'm here in the United States, [it] is so that I can make as much as a dollar even honestly. Even if it's cleaning bathrooms, but honest money. I've never taken anybody's money in Peru and even less here. . . . If you think that I'm stealing from you, call the police. Call the police.

Peña Canal went into the bathroom to wash her face, and Dann followed her in and turned off the light. Dann then grabbed Peña Canal by the neck, called her names, and said she was going to send her back to Peru. When Peña Canal answered that she actually wanted to go home, Dann reminded her of all the clothes that Dann had purchased for her.

Dann continued to insult Peña Canal often, calling her "little girl" and "shit." On March 27, 2008, Peña Canal told Dann to replace a radio she had broken, and Dann said, "You're talking to me about rights. What rights do you have in the United States? . . . You're a peasant. I'm giving you an opportunity here in this country." Peña Canal replied, "You're treating me like a slave. You're not paying me. You're not paying me. And besides that, you broke my radio." Dann countered, "This is my house. In my house, I can do whatever I want."

A few days later, Dann told her mother — in front of Peña Canal — that Peña Canal had no rights "since here in the United States, the illegal people don't even have as much as Medi-Cal. They die here." Then Dann ordered Peña Canal to sign a letter that stated that Dann had paid her minimum wage in California. The agreement stated in full:

> I, Zoraida Peña, have received from Ms. Mabelle Dann the minimum wage in the State of California starting on July 27th, 2007, for the care of her children [names omitted] home from school at 2:30 to 6:00 p.m.. In addition, I receive lodging. I occupy the entire living room for a value of $500 in rent.

> And food, breakfast, lunch, food [sic] and dinner every day.
>
> In addition to this, I have received some clothes items and gifts from members of Mabelle's family. Perfumes, clothes items, shoes, jackets, pants, et cetera. I have received a yearly total of $10,200.

Peña Canal testified that she signed the letter, knowing that its contents were false.

At trial, the prosecutor asked Peña Canal why she had stayed with Dann; Peña Canal answered: (i) she didn't trust anybody and had nowhere to go; (ii) Dann had her passport; (iii) Dann was making false accusations against her that she was taking her money; and (iv) the children were her responsibility.

### 3.　Peña Canal's Departure

Peña Canal had made friends at the twins' school when she went to pick them up. Although she did not speak English, there were a few Spanish-speakers at the school, including the school custodian, Anselma Soto ("Soto"). Peña Canal told him about her working conditions, that she had not been paid, and that she was not allowed to talk to anyone. Eventually Peña Canal began keeping some of her belongings with Soto in an envelope at the school. She also became friends with a gardener, Miguel Lopez ("Lopez"). She told him that she was afraid to leave work because Dann "was accusing her, saying that she was going to report her to immigration, that she was illegal and that she couldn't be in this country." Another mother at the school, Amy Oz ("Oz") began giving Peña Canal rides to and from school. She spoke a little Spanish, and Peña Canal told her that she would get in trouble if she was found talking with her. In March of 2008, Oz contacted La Raza Centro Legal, an organization that assists domestic workers, on Peña Canal's behalf.

Soto, Lopez, and Oz helped Peña Canal leave on April 16, 2008. Peña Canal dropped the children off at the school. She then went through the school kitchen and hid in a car that was driven to a safe house. Oz was responsible for calling Dann to tell her that she would need to pick up her children herself and that she should pick up a letter from Peña Canal at the school. The letter contained keys to Dann's apartment and asked Dann to return Peña Canal's passport and Peruvian identification.

When Dann got to the school and read the letter, she became hysterical. She said that Peña Canal had taken everything — she had emptied Dann's house, taken the keys, all her jewelry and all her money. Dann later told Oz that Peña Canal had been a terrible nanny who had stolen her jewelry. On April 21, 2008, Dann e-mailed her sister and said, "Zoraida escaped, got away, left. But at least she was here for two years. But I realized from the day she got here that she wanted to look for another job."

Meanwhile, Peña Canal met with a lawyer from La Raza Centro Legal, the immigration advocacy group with whom Oz had spoken on her behalf. She had told Oz that she wanted to stay in the United States. La Raza contacted ICE and reported Peña Canal's situation. Upon ICE's recommendation, Peña Canal was granted a T-Visa pursuant to 8 U.S.C. § 1101(a)(15)(T)(i)(I) (requiring that the victim cooperate in the prosecution of the trafficker).

Peña Canal also filed a civil suit against Dann and her mother, Vittett, seeking civil, punitive and other damages. Peña Canal was granted a default judgment and $612,812.82 in compensatory and punitive damages. *Canal v. Dann*, No. 09-03366CW, 2010 WL 3491136, at *4 (N.D. Cal. Sept. 2, 2010).

**4. Passport and Identification Papers**

Dann never returned Peña Canal's passport or Peruvian identification. A police officer testified that he went to the

apartment on Peña Canal's behalf to ask for these papers. Dann was not present but called him back later. She denied having any documents, denied knowing what he was talking about, and denied having any property that belonged to Peña Canal.

In June of 2008, ICE agents searched Dann's apartment. They found Peña Canal's passport, her Peruvian identification card, and checks for a bank account in her name, along with the agreement that Dann had forced her to sign about minimum wage, all buried under clothing in a drawer in Dann's room.

## II.   Procedural Background

On June 5, 2008, Dann was charged in a one-count indictment with harboring an illegal alien for purpose of private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (B)(i). On February 4, 2009, the government filed a superceding indictment, charging Dann with five counts: (i) conspiracy to commit visa fraud in violation of 18 U.S.C. §§ 371 and 1546(a); (ii) visa fraud in violation of 18 U.S.C. § 1546(a); (iii) forced labor and attempted forced labor in violation of 18 U.S.C. §§ 1589 and 1594; (iv) document servitude in violation of 18 U.S.C. § 1592; and (v) harboring an illegal alien for private financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (B)(i).

After a jury trial, Dann was convicted on all five counts. During deliberations, the jury asked four questions. One question was about visa fraud. The other questions were about the forced labor charge.

The district court instructed the jury that forced labor has three elements: (1) that Dann obtained or attempted to obtain the labor or services of Peña Canal; (2) by means of a scheme, plan or pattern intended to cause Peña Canal to believe that, if she did not perform such labor or services, she or another

person would suffer serious harm; and (3) that Dann acted knowingly. The jury asked, "Must the charge of forced labor apply to the entire duration of Ms. Peña Canal's service, or can it be applied only to a portion of the time?" The district court answered, "It need not apply to the entire duration of Peña Canal's service. It could be applied to only a portion of the time."

The jury also asked, "Is the duration of time relevant to determining serious harm?" The district court answered, "Yes, the duration of time is relevant. A harm that might be serious if it happened for only a short — that might not be serious if it happened for a short time might be serious if it went on for a very long time." Shortly after this instruction, the jury returned with a unanimous verdict of guilty on all five counts.

On October 15, 2009, Dann filed a motion for judgment of acquittal and/or motion for new trial. Dann had also made an oral motion for a judgment of acquittal after the government rested and at the close of all the evidence. The district court denied these motions in a written order on December 23, 2009. *United States v. Dann*, No. 08-00390, 2009 WL 5062345 (N.D. Cal. Dec. 23, 2009).

On April 14, 2010, the district court sentenced Dann to 60 months on each count, to run concurrently. The court also ordered restitution in the amount of $123,740.34, payable to Peña Canal. As part of this restitution, the district court ordered that any accrued child support payable to Dann while she is incarcerated be paid directly to Peña Canal.

Dann filed a notice of appeal on April 22, 2010. On April 28, 2010, she filed a motion under Federal Rule of Criminal Procedure 35(a) to correct the sentence on the grounds that the district court erred when it ordered accrued child support to be paid to the victim. The district court denied this motion

on July 22, 2010. *United States v. Dann*, No. 08-00390, 2010 WL 2891585 (N.D. Cal. July 22, 2010).

Dann appeals her conviction and sentence. We address each in turn below.

## CONVICTION

*I.   Standard of Review*

Dann argues on appeal that there was insufficient evidence to support her conviction for forced labor, document servitude, and harboring an illegal alien for financial gain. The Court reviews the district court's denial of a motion for acquittal *de novo*. *See, e.g.*, *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002).

The Court asks whether, "[a]fter viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The analysis requires two steps: First, the court reviews the evidence presented at trial in the light most favorable to the prosecution; then, the court determines whether the evidence, so construed, would allow any rational trier of fact to find the defendant guilty of the crime beyond a reasonable doubt. *See, e.g.*, *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). The *Nevils* court cautioned:

> This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. Rather, when faced with a record of historical facts that supports conflicting inferences a reviewing court must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such con-

flicts in favor of the prosecution, and must defer to that resolution.

*Id.* (quotation marks and citations omitted).

Nevertheless, Dann will prevail if, once all of the evidence has been construed in favor of the government, the evidence is still "so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt." *Id.* at 1167.

## II.  *Discussion*

Dann argues that the evidence was insufficient to support a conviction for three of the five crimes for which she was convicted: forced labor, document servitude, and alien harboring for financial gain. We consider each in turn.

### A.  **Forced Labor**

First, Dann argues that she should be acquitted of forced labor because there was insufficient evidence that she intended to threaten serious harm.

The federal forced labor statute, 18 U.S.C. § 1589(a), provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process;

or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection(d).

The government limited this case to the fourth means of violating the forced labor statute, and the court instructed:

If you find that Dann obtained the labor or services of Peña Canal, then you must determine whether she did so by means of a scheme, plan, or pattern intended to cause Peña Canal to believe that, if she did not perform such labor or services, she or another person would suffer serious harm.

The court then defined serious harm exactly as described in the statute, which includes "physical or nonphysical" harm, "including psychological, financial or reputational harm." 18 U.S.C. § 1589(c)(2). The jury convicted on this count.

Dann does not challenge the instruction. Rather she argues that her relationship with Peña Canal does not fit within the forced labor statute and that the evidence presented was insufficient to support the conviction as a matter of law.

### 1. Serious Harm Under § 1589

The acts proved by the government in this case are well within the scope of the Victims of Trafficking and Violence

Protection Act of 2000. Pub. L. No. 106-386, 114 Stat. 1464. Legislative history suggests that Congress passed this act to correct what they viewed as the Supreme Court's mistaken holding in *United States v. Kozminski*, 487 U.S. 931 (1988). *Kozminski* limited the definition of involuntary servitude to "physical" or "legal" coercion. *Id.* at 952. In § 1589, Congress intended to "reach cases in which persons are held in a condition of servitude through nonviolent coercion." Victims of Trafficking and Violence Protection Act of 2000 § 102(b)(13).

[1] Congress concluded that the means used by modern-day traffickers are "increasingly subtle." H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.), 2000 WL 1479163, at *91. And therefore § 1589 defines harm broadly as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). In other words, someone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm — physical or nonphysical, including psychological, financial, reputation harm — that would compel someone in her circumstances to continue working to avoid that harm. *See, e.g., United States v. Calimlim*, 538 F.3d 706, 712, 714 (7th Cir. 2008) (finding threat to stop paying victim's poor family members constitutes serious harm).

To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor. First, the threat of harm must be serious. Congress intended to address serious trafficking, or cases

"where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Rep. No. 106-939, at 101 (Conf. Rep.). According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to compel that person to remain. *See* 18 U.S.C. § 1589(c)(2).

Second, the scope of the statute is narrowed by the requirement of *scienter. Calimlim*, 538 F.3d at 711-12. The jury must find that the employer intended to cause the victim to believe that she would suffer serious harm — from the vantage point of the victim — if she did not continue to work. While the serious harm need not be effectuated at the defendant's hand, the statute "requires that the plan be intended to cause the victim to believe that that harm will befall her." *Id.* (internal quotation marks and punctuation omitted). The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her.

### 2.  Evidence of Intent

Here, Dann argues that there was insufficient evidence that she *intended* to make Peña Canal believe that she would suffer serious harm if she were to stop working for Dann. The government counters that the evidence supports Dann's intent to have Peña Canal believe: (i) that she would not be paid back wages for close to two years of work and in fact would owe Dann $8,000 for expenses already paid; (ii) that Dann would falsely accuse her of wrongdoing and cause reputational harm; (iii) that Peña Canal would suffer immigration consequences because she would either not be able to leave the country at all (since Dann held her passport and papers) *or* she would be sent back to Peru and would not have the

opportunity to study in the United States; and (iv) that the children for whom she cared would be taken from their mother.[3]

While we consider each of these harms separately below, we are to ask whether, from the vantage point of an immigrant in Peña Canal's position, these harms — taken together — were sufficiently serious so as to compel her to remain in Dann's employ.

### a.   Financial Harm

First, Dann argues that there was insufficient evidence that Dann intended Peña Canal to believe that she would suffer serious financial harm if she were to leave. Dann points out that Peña Canal never testified that Dann *told* her that she would not be paid back wages. That may well be true, but the inference was clear. Dann told Peña Canal that she would *owe* money if she left. After one argument, Dann said, "I'm giving

---

[3]Dann suggests on appeal that the government has waived its right to argue as to these last two harms because the government focused primarily on financial and reputational harm at trial and in response to the defendant's post-trial Rule 25(a) motion. *See McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

In this case, however, the jury was instructed clearly on the broad definition of "serious harm." At this stage in the litigation, we are to ask whether the evidence produced at trial was sufficient for any reasonable juror to convict according to the instructions that he was given. While the government focused on reputational and financial harm, there was surely evidence of other harms presented to the jury. And in fact, the jury may have concluded that the combination of these various harms was sufficiently serious as to compel a reasonable person in the victim's position to continue to work. This is not a case where the government suddenly suggests on appeal an entirely different theory that would have required different instructions. *Cf. id.*

you a chance to be here in this country. I'm going to buy your ticket right now. But first, I'm going to figure out our accounts." And then she concluded that Peña Canal owed her a total of $15,000, of which only $7,000 had been worked off. On another occasion, when Peña Canal told Dann to send her home, Dann began to calculate the cost of clothes that she had purchased for Peña Canal.

Moreover, as the district court pointed out, Dann made Peña Canal sign a note stating that she had been paid minimum wage. The district court found this fact persuasive:

> The jury could make three reasonable inferences from this note when considered in conjunction with Defendant's false promises to pay Ms. Peña Canal and the debt Defendant imposed on Ms. Peña Canal: (1) Defendant had no intention of paying Ms. Peña Canal, (2) Defendant had a consciousness of guilt for not paying Ms. Peña Canal so she wanted to preserve the note to guard against any possible future charges and (3) Defendant wanted Ms. Peña Canal to be aware that Defendant would keep this note to deter her from trying to enforce her rights.

*Dann*, 2009 WL 5062345, at \*2. We agree.

**[2]** We conclude that there was sufficient evidence for a reasonable juror to find that Dann intended Peña Canal to believe that Peña Canal would suffer financial harm and that that financial harm was "sufficiently serious" within the meaning of the statute. For an immigrant without access to a bank account and not a dollar to her name, a juror could conclude that the failure to pay her — and thus the lack of money to leave or live — was sufficiently serious to compel Peña Canal to continue working.[4]

---

[4]Dann argues that the government's case fails because Peña Canal told officials that "it wasn't about the money," that she didn't stay for the

### b.  Reputational Harm

**[3]** Second, Dann argues that there was insufficient evidence that Dann intended that Peña Canal believe that Peña Canal would suffer reputational harm if she were to leave. Again, Dann points out that Peña Canal never testified that Dann *told* her that she would call Peña Canal a thief if she left or that Dann would tell people back in Peru that she was untrustworthy. But here again, we are to draw every inference in favor of the guilty verdict.

**[4]** The jury heard evidence that Dann falsely accused Peña Canal of theft on four occasions. The jury could reasonably conclude that Dann intended Peña Canal to believe that she would in fact falsely accuse her when she left. And in fact that fear was realized: When Dann read Peña Canal's letter, she told everyone within earshot at the school that Peña Canal was a thief who had robbed her and taken everything she had.

### c.  Immigration Harm

**[5]** There was also evidence that Dann intended Peña Canal to fear immigration harm. As the Seventh Circuit articulated in *Calimlim*, a victim has fewer means of escape where the threats in her case involve immigration. 538 F.3d at 712 (noting that the immigrant victim "did not have an exit option: because the threats in her case involved her immigration status, she could not freely work for another employer in order to escape the threatened harm.").

**[6]** While Dann never explicitly threatened deportation, she did repeatedly threaten to send Peña Canal back to Peru.

---

money. As we have said, however, the linchpin of this analysis is the intent of the employer, or in this case what Dann *intended* Peña Canal to believe in order to induce her to stay in her employ. And here it is clear that a reasonable juror could conclude that Dann intended Peña Canal to believe that she would suffer financial harm if she were to leave.

That threat alone — to be forced to leave the country — could constitute serious harm to an immigrant who came to the United States in part to study English and who dreamed of starting a business. *See United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008) (noting that the defendant's threats to send victim back to Cameroon were coercive in light of the victim's special vulnerability as illegal immigrant). Dann also had custody of Peña Canal's passport and Peruvian identification; Peña Canal testified that she stayed in part because Dann held her papers. And in fact, when she did leave, the only request she made of Dann in her closing letter was the return of her Peruvian passport and identification.

[7] Thus the evidence, taken in the light most favorable to the prosecution, suggests that Dann intended to inspire two related immigration fears in Peña Canal: that she would be forced to leave the country *or* that she would not be able to leave the country because she had no documents. Both threats are serious, and this exercise of control is further evidence of scienter. And in fact Dann used the word "escape" to describe Peña Canal's eventual departure.[5] A juror could reasonably have concluded that Dann intended to keep Peña Canal in fear of serious immigration consequences.

### d.   Harm to the Children

[8] Finally, there was evidence to suggest that Dann intended Peña Canal to fear what would happen to the children if she were to leave. Such a fear is squarely within the intent of Congress, which enacted § 1589 to address "traffickers [who] use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave, *as when a nanny is led to believe that the*

---

[5]Specifically, on April 21, 2008, Dann e-mailed her sister and said, "Zoraida escaped, got away, left. But at least she was here for two years. But I realized from the day she got here that she wanted to look for another job."

*children in her care will be harmed if she leaves the home.*"
H.R. Rep. No. 106-939, at 101 (Conf. Rep.) (emphasis
added).

**[9]** Peña Canal testified that she did not leave because she
worried about what would happen to the children. In February
of 2007, Dann told her,

> You shouldn't — you shouldn't think that I'm treat-
> ing you like a slave, you shouldn't think that I'm
> treating you like a slave. I'm going to pay you. I
> don't want for you to leave me because I don't know
> what would happen to my children. Where would I
> keep them? The government would take them from
> me.

There are two reasonable interpretations: Dann may have
been apologizing for not paying Peña Canal and pleading with
her to stay so that she would not lose her children. Alterna-
tively, Dann may have been threatening that the children
would suffer if Peña Canal were to leave — exactly the type
of coercion that Congress envisioned. Again, drawing all
inferences in favor of the verdict, we must assume that the
jury came to the latter conclusion. A juror could conclude that
a reasonable person in Peña Canal's position — that is, a
nanny who had cared for three boys from infancy — would
feel compelled to stay on account of such a threat.

**[10]** In sum, a reasonable juror could have concluded that
Dann intended to cause Peña Canal to believe that she would
suffer financial, reputational, and immigration harms, as well
as cause harm to Dann's children. Such a juror could further
conclude that the *sum* of these threatened harms would have
compelled a reasonable person in Peña Canal's position to
continue to work for Dann. Having determined that there was
sufficient evidence to support Dann's conviction for forced
labor, we AFFIRM the district court's denial of Dann's Rule
35(a) motion on this ground.

### B. Document Servitude

**[11]** Dann also challenges her conviction for document servitude, which arises out of her forced labor conviction. Document servitude occurs where a defendant "knowingly . . . conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document . . . of another person . . . in the course of" trafficking, peonage, slavery, involuntary servitude or forced labor. 18 U.S.C. § 1592(a)(1). The district court instructed the jury on the three elements of this crime as follows:

> First, Ms. Dann concealed, removed, confiscated, or possessed Ms. Peña Canal's passport or other immigration document or government identification document. Second, such acts were undertaken in the course of committing or with the intent to commit the crime of forced labor. Third, that Ms. Dann acted knowingly in doing such an act or acts.

Dann challenges the second element.

Dann first argues that there was insufficient evidence that she had any intent to commit forced labor, an argument we have already rejected. Second, Dann argues that even if she had the intent to commit forced labor, she did not keep Peña Canal's documents in order to commit that offense. She notes that Peña Canal testified that she gave her documents to Dann because she did not have any safe place to put them; she did not testify that she looked for the documents or that she asked Dann to give them back to her. Indeed, this case stands in contrast to other document servitude cases where the passports were kept in a locked drawer, or where an employer confiscated documents upon arrival. *See, e.g.*, *United States v. Sabhnani*, 599 F.3d 215, 245 (2d Cir. 2010); *United States v. Farrell,* 563 F.3d 364, 376-77 (8th Cir. 2009).

**[12]** The statute, however, requires merely that the defendant "possess[ ]" the document, not that the defendant lock it

up. 18 U.S.C. § 1592(a). Here, the jury heard evidence that when the police asked Dann for the papers on Peña Canal's behalf, she claimed that she did not have them. They heard evidence that the documents were ultimately found alongside the note about minimum wage, buried under clothes in a drawer.

Again, there are two stories. Dann may have kept the passport for safe keeping and may have genuinely believed that she did not have it when the police asked. Alternatively, she may have hid the passport in a place where Peña Canal likely would not have found it, along with the false minimum wage note, in order to prevent Peña Canal from leaving. Construing all inferences in favor of the verdict, we must assume the latter. A rational juror could have concluded that Dann possessed and concealed Peña Canal's passport as part of her plan to cause Peña Canal to believe that she could not leave, or that she would suffer serious harm if she did.

**[13]** We conclude that there was sufficient evidence to support Dann's conviction for document servitude and AFFIRM the district court's denial of Dann's 35(a) motion on this ground as well.

## C.   Alien Harboring for Financial Gain

Finally, Dann challenges her conviction for alien harboring for financial gain. The district court instructed the jury that to convict Dann on this count, it had to find:

> First, that Ms. Peña Canal was an alien. Second, Ms. Peña Canal had come to, entered, or remained unlawfully in the United States. Third, Ms. Dann knew or was in reckless disregard of the fact that Ms. Peña Canal had come to, entered, or remained unlawfully in the United States. Fourth, Ms. Dann concealed, harbored, or shielded Ms. Peña Canal for the purpose of avoiding Ms. Peña Canal's detection

by the immigration authorities. And fifth, Ms. Dann concealed, harbored, or shielded Ms. Peña Canal for the purpose of private financial gain.

Dann challenges the sufficiency of the evidence on the fourth element.

As a preliminary matter, the parties disagree as to whether the government had to prove that Dann harbored Peña Canal to prevent detection by immigration authorities. The government argues that according to *United States v. Acosta de Evans*, harboring does not require that the defendant actively take steps to hide the alien from immigration authorities; it is sufficient that the defendant provided the alien with shelter for financial gain. 531 F.2d 428, 430 (9th Cir. 1976).

**[14]** Although the government is correct, the jury was instructed on a different standard: specifically, it was asked whether "Ms. Dann concealed, harbored, or shielded Ms. Peña Canal *for the purpose of avoiding Ms. Peña Canal's detection by the immigration authorities*." To convict Dann, according to this instruction, the jury had to find that she expressly shielded her from immigration authorities, not just that she gave her shelter. Dann argues, and we agree, that this Court is bound by that instruction. *See Chiarella v. United States*, 445 U.S. 222, 236 (1980) ("We cannot affirm a criminal conviction on the basis of a theory not presented to the jury."); *McCormick*, 500 U.S. at 270 n.8.

The district court found, based on this standard, that there was sufficient evidence for a reasonable juror to conclude that Dann shielded Peña Canal for the purpose of avoiding detection by immigration authorities. Dann restricted Peña Canal's movement and forbade her from speaking to anyone outside the home. Dann even asked the manager of the apartment complex to tell the Spanish-speaking staff not to talk to Peña Canal. Dann repeatedly reminded Peña Canal of her illegal status and asked if Peña Canal was "scared" when she talked

to a police officer. Whenever Peña Canal came into the house, Dann or her mother would ask if she had spoken to anyone.

**[15]** Dann contends that this story is more consistent with someone who did not want her good employee to be poached. That interpretation is plausible, but it is not the only one. The same evidence suggests that Dann was harboring Peña Canal from immigration authorities. And that inference is more plausible given the fact that Dann, herself, was implicated in the visa fraud.

**[16]** We conclude therefore that there was sufficient evidence to support Dann's conviction for alien harboring for financial gain, and AFFIRM the district court's denial of Dann's Rule 35(a) motion on this final claim.

## SENTENCING

In addition to challenging her conviction, Dann challenges the district court's sentencing guideline calculation and the restitution order that required her to sign over to the victim any payments made by her ex-husband toward accrued child support.

### I. *Standard of Review*

This Court reviews "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Grissom*, 525 F.3d 691, 696 (9th Cir. 2008) (internal quotation marks and citation omitted). "A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error. The legality of an order of restitution is reviewed de novo." *United States v. Foreman*, 329 F.3d 1037,

1039 (9th Cir. 2003) (internal quotation marks and citations omitted).

II.   *Discussion*

## A.   Guidelines Enhancements

The district court accepted the Guidelines calculation in Dann's Pre-Sentence Report ("PSR"), which calculated Dann's offense at a base level of 27, her criminal history as Category I, with the resulting Guidelines prison range of 70 to 87 months. The probation officer recommended, and the court agreed, to a prison term of 60 months under 18 U.S.C. § 3553, based on her behavioral and mental health issues.[6] The district court did not comment on the three contested enhancements to which the defendant objected at sentencing.

Dann argues on appeal that the district court erred in applying the following Guidelines enhancements to her sentence: for visa fraud, a four-level enhancement for committing visa fraud with reason to believe that the visa would be used to facilitate a felony; and for forced labor, a three-level enhancement for holding a victim in document servitude for over a year and a two-level enhancement for committing a felony (visa fraud) in connection with forced labor. We consider each in turn.

### 1.   Visa Fraud Enhancement

Visa fraud falls under § 2L2.1 of the U.S. Sentencing Guidelines Manual, which governs "Trafficking in a Document Relating to Naturalization, Citizenship, or Legal Resident Status, or a United States Passport; False Statement in Respect to the Citizenship or Immigration Status of Another[.]" The base offense level under this Guideline is eleven

---

[6]Notably, on appeal Dann does not challenge the reasonableness of this sentence of 60 months. She challenges only the Guidelines calculation.

and includes an enhancement of four levels "[i]f the defendant knew, believed, or had reason to believe that a passport or visa was to be used to facilitate the commission of a felony offense, other than an offense involving violation of the immigration laws." U.S.S.G. § 2L2.1(b)(3). In the PSR, the probation officer reasoned that "the defendant had reason to believe that the visa would facilitate her conduct that rose to a felony, unlawful conduct regarding documents in furtherance of servitude." Dann argues that the trial court erred in imposing this enhancement because the crime of document servitude — identified by the probation officer — is "an offense involving violation of the immigration laws" and is thus excepted by the clear language of the Guidelines.

We need not reach this argument. Dann's base offense level of 27 was driven by the forced labor offense and not visa fraud. An enhancement on visa fraud would not affect the Guideline range, and therefore any error would be harmless.[7] *Cf. United States v. Munoz-Camarena*, 631 F.3d 1028 (9th Cir. 2011).

## 2. Forced Labor Enhancements

[17] Next, Dann challenges the Guideline enhancements to her base offense level on the forced labor conviction. Sentencing for forced labor is governed by § 2H4.1 of the U.S. Sentencing Guidelines Manual, for "Peonage, Involuntary Servitude, Slave Trade, and Child Soldiers." The base level is 22. The offense may be subject to a three-level enhancement "[i]f any victim was held in a condition of peonage or involuntary servitude for [ ] more than one year," U.S.S.G.

---

[7]Indeed, it is not clear that the trial court even applied this enhancement. During the sentencing hearing, the trial judge said, "Your objection had to do with the visa count and whether the visa offense was in furtherance of another immigration offense, and that would appear to be a moot point because the visa offense isn't the one that's driving the guideline calculation."

§ 2H4.1(b)(3),[8] and an additional two-level enhancement "[i]f any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense," *id.* § 2H4.1(b)(4). Here, the district court applied both of these enhancements over Dann's objections.

This Court reviews a district court's factual findings in support of a sentencing enhancement for clear error. *United States v. Rivera-Alonzo*, 584 F.3d 829, 836 (9th Cir. 2009) (citation omitted). "Reversal for clear error requires a definite and firm conviction that the district court made a mistake." *Rodriguez v. United States*, 542 F.3d 704, 711 (9th Cir. 2008) (internal quotation marks and citation omitted).

### a. More than one year

Dann argues that the evidence before the district court failed to show that she had held Peña Canal in forced labor for more than one year, or from at least April 15, 2007 until her escape on April 16, 2008. She contends that the evidence supported forced labor for a much shorter period. The government's closing argument focused on the beginning of 2008 when Dann's conduct was at its worst. And in fact, the jury asked whether the charge of forced labor had to apply to the entire duration of Peña Canal's service. The question may suggest that the jury believed that Peña Canal was not subject to forced labor for the entire time that she resided with Dann.

To be sure, the government's evidence indicated that the worst of Dann's bad behavior occurred in or after January 2008. It was at that time that Dann told Peña Canal that she owed $15,000. Thereafter, Dann became increasingly controlling and abusive, ultimately physically accosting Peña Canal. Dann then forced Peña Canal to sign the "agreement" stating that she had been paid minimum wage.

---

[8]Application Note 1 defines "peonage or involuntary servitude" as including forced labor. U.S.S.G. § 2H4.1 cmt. n.1.

Nevertheless, there was sufficient evidence for the trial judge to find by a preponderance of the evidence that Peña Canal was subject to forced labor prior to April 2007. She testified that Dann began to restrict her movement by January of 2007 and forbade her from leaving the apartment without her permission. She told Peña Canal not to "talk to anybody, not to reveal anything about us, don't tell anybody anything." Dann even told the property manager of the apartment complex to order Spanish-speaking personnel not to talk with Peña Canal.

Sometime in the winter of 2007, Dann also began restricting Peña Canal's food intake, forbidding her from eating fruit and drinking tea without permission and eventually weighing the meat and counting the eggs and bread. It was in February of 2007 that Dann told Peña Canal:

> You shouldn't — you shouldn't think that I'm treating you like a slave, you shouldn't think that I'm treating you like a slave. I'm going to pay you. I don't want for you to leave me because I don't know what would happen to my children. Where would I keep them? The government would take them from me.

The district court could have reasonably concluded that Dann already knew the implications of her conduct with Peña Canal — that she was in fact treating her like a slave. By April of 2007, Peña Canal had already foregone eight months in unpaid wages that she risked losing if she were to leave.

**[18]** We conclude that the district court did not clearly err when it found that Peña Canal had been held in forced labor for over one year and therefore AFFIRM the district court's Guideline enhancement.

### b. Felony in connection with forced labor

Finally, Dann challenges the sentencing enhancement for committing another felony "during the commission of, or in

connection with" forced labor under § 2H4.1(b)(4) of the U.S. Sentencing Guidelines Manual. The district court adopted the PSR, which suggested that Dann committed the felony of visa fraud in connection with the forced labor. Dann argues that at the time that she committed visa fraud, she had no intention of committing forced labor. These crimes, she argues, are entirely unrelated.

**[19]** Section 2H4.1(b)(4) of the U.S. Sentencing Guidelines Manual provides in full:

> If any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of:
>
>     (A) 2 plus the offense level as determined above, or
>
>     (B) 2 plus the offense guideline applicable to that other offense, but in no event greater than level 43.

The first step in our analysis is to determine what it means to commit a crime "in connection with" forced labor under § 2H4.1(b)(4). This is a matter of first impression, as the commentary in this section does not define the term and no court has interpreted the language of this enhancement.

There is, however, an analogous provision in the offense guideline for unlawful possession of a firearm, U.S.S.G. § 2K2.1(b)(6):

> If the defendant used or possessed any firearm or ammunition *in connection with another felony offense*; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed *in connection with another felony offense*, increase by 4 levels.

(emphasis added). The commentary of § 2K2.1(b)(6) states that possession of a firearm "in connection with" another felony applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively." U.S.S.G. § 2K2.1 cmt. 14.

Clearly, the drafters must be held to define terms consistently throughout the Guidelines. Thus "in connection with" must mean *facilitation*. In the forced labor context, a felony is committed "in connection with" forced labor where that crime facilitates or has the potential of facilitating forced labor — or conversely where forced labor facilitates or has the potential of facilitating another felony offense. In this case, it is clear that the visa fraud facilitated the forced labor. Indeed, as we have explained, Dann used Peña Canal's illegal immigration status to intimidate her, to cause her to fear deportation or to fear the risk of leaving without documentation. This evidence is sufficient to show that Dann committed forced labor in connection with visa fraud.

Dann, however, suggests that according to our holding in *United States v. Jimison,* "in connection with" requires an additional element of intent. 493 F.3d 1148, 1149 (9th Cir. 2007). She argues that the enhancement applies only where the defendant commits the first felony (either forced labor or the other crime) with the intent to commit the other. This argument is unavailing. In *Jimison*, we interpreted the second half of § 2K2.1(b)(6)— the enhancement that applies where a defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6). We held that, to prove the application of this enhancement, the government must provide sufficient evidence that when the defendant came into possession of the firearm, he had a "firm intent" to use it to commit a felony. *Jimison*, 493 F.3d at 1149. The intent requirement was drawn directly from the language of the enhancement (requiring "knowledge, intent, or reason to believe"). There is

no comparable intent language in the forced labor Guideline under U.S.S.G. § 2K2.1, and we cannot read intent into the provision.

**[20]** We conclude therefore that a felony is committed "in connection with" forced labor where it facilitates or is facilitated by the offense of forced labor. And because in this case visa fraud facilitated Dann's commission of forced labor, the district court's Guideline enhancement is AFFIRMED.

## B.　Restitution Order

Finally, we turn to the district court's restitution order. At sentencing, the Court ordered Dann to pay $123,740.34 in restitution and required that "any payments made by [Dann's ex-husband] toward back child support that he owes shall be signed over to the victim as payment towards restitution." Dann filed a motion under Federal Rule of Criminal Procedure 35(a) to correct the sentence on the grounds that the district court erred when it ordered accrued child support to be paid to Peña Canal. The district court denied the Rule 35(a) motion.[9]

---

[9]The district court held in relevant part:

　　Although no authority directly addresses the issue presented in this motion, case law appears to support the view that child support in the form of arrearages is a debt owed to the children if the children stand to benefit from the payments. The debt is owed to the custodial parent when the children will not benefit from the payment of the arrearages.

　　Here, Defendant will be incarcerated for a period of years. Child support arrearages paid to her will not benefit her children during her period of incarceration. Accordingly, the Court will not modify its restitution order at this time. If child support arrearages are received by Defendant at a time when she has custody of the children and needs the arrearages to support them, she may move for modification of the restitution order, setting out her financial circumstances and how the money will be used for the benefit of her children. Similarly, if Defendant receives

On appeal, Dann argues that the district court erred by assigning a debt that did not belong to Dann but rather to her minor children, who are now sixteen, ten, and ten years old respectively. This Court reviews legal issues regarding a restitution order *de novo*. *Foreman*, 329 F.3d at 1039.

**[21]** The Mandatory Victims Restitution Act requires that a district court consider three factors before ordering restitution: "(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents." 18 U.S.C. § 3664(f)(2)(A)-(C). Any restitution order under this section may be enforced only as against property that is the defendant's own according to the relevant state law. *See, e.g.*, *United States v. Berger*, 574 F.3d 1202, 1205 (9th Cir. 2009); *In re Ramirez*, 795 F.2d 1494, 1497 (9th Cir. 1986) ("The determination of child support rights is a matter of state statutory and common law."), *superseded by statute as recognized in In re Leibowitz*, 217 F.3d 799, 800 (9th Cir. 2000).

**[22]** The question before the Court is whether child support arrearages belong to Dann such that they may be assigned to the victim by a restitution order, or whether the arrearage actually belongs to her children. This is a matter of first impression.

---

arrearages at a time when someone other than herself or [defendant's ex-husband] has custody of the children, and the money is needed to support the children, she can move to modify the restitution order so that she is allowed to sign over the arrearages to the guardian rather than to the victim. During the time these child support arrearages were accruing, Defendant and her children were receiving the benefit of unpaid childcare services from the victim. It is equitable that these arrearages be paid over, although belatedly, to the victim.

*Dann*, 2010 WL 2891585, at *2.

As a general rule, a parent's obligation to pay child support runs to *the child*, rather than to the other parent, and "the parent, to whom such support is paid, is but a mere conduit for the disbursement of that support." *Williams v. Williams*, 8 Cal. App. 3d 636, 640 (1970). Indeed, the equities between the parents do not alter the child support obligation. *Comer*, 14 Cal. 4th 504, 516 (1996).

We acknowledge California authority recognizing that when a custodial parent has expended her own resources, she may recover the accrued child support *for her own benefit*, and that that right of reimbursement may be assigned in certain circumstances. *See, e.g.*, *In re Marriage of Utigard*, 126 Cal. App. 3d 133, 141-42 (1981)); Cal. Welf. & Inst. Code § 11477(a) (requiring the assignment of child support arrearages to the state where the state has dispersed cash assistance to the child).

The California Supreme Court holdings in *In re Marriage of Damico* and *Comer*, however, suggest that even the assignable right of reimbursement to the custodial parent is superceded if reimbursement is sought when the children are minors. *In re Marriage of Damico,* 7 Cal. 4th 673 (1994)*; Comer*, 14 Cal. 4th at 516. For example, the *Damico* court held that a custodial parent is estopped from bringing a claim for accrued child support if she concealed the children from the non-custodial parent when the children were minors. *Damico*, 7 Cal. 4th at 684-85. In *Comer*, however, this holding was limited to cases where the custodial parent brings a suit *after the children have reached majority*. 14 Cal. 4th at 516. A custodial parent may sue for accrued child support even if she previously concealed the child, so long as the child is not yet an adult. *Id. Comer* thus seems to suggest that accrued payments belong to the child until adulthood.

The *Comer* court explained that

   [t]his distinction [regarding the child's age] is a significant one, because, in contrast to most adults, chil-

dren (particularly those in their early years) in fairness cannot be expected to raise themselves and pursue an education without the financial support of responsible adults . . . The child's need for sustenance must be the paramount consideration.

*Id.* at 516 (quotation marks and citation omitted). If child support has not been paid for a period of time, it is likely that the child's needs were met at only a minimal level. *Id.* at 517-18. Thus, a child may have accrued needs, including educational expenses or cultural opportunities, that may be met by an accrued child support payment, and these needs trump the custodial parent's entitlement to reimbursement.

**[23]** Read together, *Damico* and *Comer* suggest that so long as the children have not reached majority, a custodial parent remains the "conduit" for child support — even accrued child support. We therefore conclude that under California law, a creditor (in this case a crime victim with a restitution order) is not entitled to accrued child support payments owed to a custodial parent of children who have not yet reached the age of majority.

*In re Estate of Spirtos*, 443 F.3d 1172, 1177 n.4 (9th Cir. 2006), is not to the contrary. In a footnote, this Court noted that "[u]nder California law, 'the custodial parent, not the child, has the beneficial interest in collecting arrearages in child support.' " *Id.* (quoting *Cnty. of Shasta v. Smith*, 38 Cal. App. 4th 329, 335 (1995) and citing *In re Marriage of Lackey*, 143 Cal. App. 3d 698, 706 (1983) and *Utigard*, 126 Cal. App. 3d at 143). *Spirtos*, *Shasta* and *Lackey* cite *Utigard* for the proposition that a child is not the real party of interest in accrued child support. *Spirtos*, 443 F.3d at 1177 n.4; *Shasta*, 38 Cal. App. 4th at 335; *Lackey*, 143 Cal. App. 3d at 706.

*Utigard*, however, involved *adult* children's interest in collecting child support arrearages. 126 Cal. App. 3d at 137 ("Mary Lou . . . and four of her *adult* children appeal from the

judgment.") (emphasis added). In *Utigard*, the court addressed a property dispute after a divorce. The plaintiff's ex-husband conveyed their marital home to his new wife in an attempt to avoid a writ of execution for then accrued child support. When the plaintiff eventually filed an action under the Uniform Fraudulent Conveyance Act five years later, the trial court found that the statute of limitations had run. Because her children — who were minors at the time of the conveyance — were not barred by the statute of limitations, she attempted to have the writ of execution issued in their names. In a very narrow ruling, the *Utigard* court found that the now adult children had no interest in the accrued child support. *Id.* at 143.

The *Utigard* court noted that in this case "no issue [was] tendered concerning the present or future needs of the children, nor any issue concerning the relation of the unpaid support to the children's needs." 126 Cal. App. 3d at 139. They declined to reach the "question under what conditions the children might be deemed the beneficiaries of arrearages in child support. . . . Similarly, [they did] not decide how to resolve a dispute between parent and child as to entitlement to arrearages." *Id.* at 144.

Indeed, the holding in *Utigard* seems to hinge precisely on the fact that the case did not involve minor children who needed funds. Throughout the case law, California courts are guided by a fundamental principle: "In any proceedings involving custody and support it is axiomatic that the court should always adopt the course that is for the best interests of the child." *Comer*, 14 Cal. 4th at 517 (internal quotation marks omitted) (quoting *Evans v. Evans*, 185 Cal. App. 2d 566, 572 (1960)).

We have therefore concluded that under California law, the custodial parent is a conduit for accrued child support to meet the needs of her minor children. In the case at hand, however, the district court pointed out that Dann is not currently the

custodial parent. Because Dann is incarcerated, the district court assumed that payments made to her would not benefit her children. Like a parent of a child who has reached the age of majority, the district court reasoned, Dann is entitled to accrued child support as reimbursement to her personally for the funds that she expended to care for her children while she was not receiving support. Accordingly the funds belong to Dann and not to her children; and any sums received should be paid to Peña Canal, who provided child support services during this time period.

While at first glance the district court's order seems equitable in this particular case, its implications are troubling. The district court assumed that accrued child support payments paid to Dann would not benefit Dann's children simply because Dann is incarcerated. By this logic, young children of incarcerated parents could lose the benefit of accrued child support payments which — as the district court recognized — the children may very well need.[10] Indeed, the children of incarcerated women are especially vulnerable. They have likely accrued needs that may be met by *any* payments of support, even late ones.

**[24]** The district court erred when it assumed that these funds belonged to Dann in the first instance. As applied to these facts, we read California law as stating that, until a child reaches the age of majority, the *child* is the real party of interest in child support arrearages. To the extent that accrued child support payments are made to a parent while she is in prison, she remains a conduit for her child's support and free to disperse those funds for the care of her child. *See Comer*, 14 Cal. 4th at 516; *Williams*, 8 Cal. App. 3d at 640. Accrued child support is simply not the property of the parent (of a

---

[10]The court suggested that the defendant may move to modify the order when she regains custody of the children, or she could move to modify the order "so that she is allowed to sign over the arrearages" to a guardian of her children while she is incarcerated. *Dann*, 2010 WL 2891585, at *2.

child who has not yet reached majority) to be redistributed to a victim as restitution.

We should note that the district court's order in this case also raises practical challenges. The single most important question in an action that involves child support in any form is the need and interest of the minor child. *See In re Marriage of Lippel,* 51 Cal. 3d 1160, 1172 n.4 (1990). State family courts or probate courts are best equipped to balance the equities and determine the best interest of children, and federal courts should not interfere by exercising authority over child support payments in a criminal proceeding. In the case at hand, for instance, the children were not represented. No guardian ad litem weighed in at the sentencing hearing in federal court when the restitution order was rendered. Although perhaps equitable in the instant case, a restitution order simply cannot redistribute child support — or accrued child support — where minor children are involved.

**[25]** The district court's order directing that accrued child support payments be made directly to Peña Canal is REVERSED.

**AFFIRMED IN PART, REVERSED IN PART.**