**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CESAR MARTÍNEZ-RODRÍGUEZ;
DALIA PADILLA-LÓPEZ; MAYRA
MÚÑOZ-LARA; BRENDA GASTÉLUM-
SIERRA; LESLIE ORTIZ-GARCÍA;
RICARDO NERI-CAMACHO,
*Plaintiffs-Appellants*,

v.

CURTIS GILES, an individual; DAVID
FUNK, an individual; FUNK DAIRY,
INC., an Idaho corporation;
SHOESOLE FARMS, INC., an Idaho
corporation; DOES, 1–10,
*Defendants-Appellees*.

No. 19-35526

D.C. No.
1:17-cv-00001-
DCN

OPINION

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted June 4, 2020
Portland, Oregon

Filed April 18, 2022

Before:  Marsha S. Berzon and Daniel P. Collins, Circuit Judges, and Jennifer Choe-Groves,[*] Judge.

Opinion by Judge Collins

---

## SUMMARY[**]

---

### Forced Labor

The panel reversed the district court's summary judgment in favor of defendants on claims of violation of federal statutory prohibitions on forced labor, reversed the district court's decision declining to retain supplemental jurisdiction over state law claims, and remanded.

Plaintiffs were six citizens of Mexico who were recruited to work as "Animal Scientists" at Funk Dairy in Idaho under the "TN Visa" program for "professional" employees established under the North American Free Trade Agreement.  But when plaintiffs arrived at the dairy, they were instead required to work substantially as general laborers.  Plaintiffs alleged that defendants' bait-and-switch tactics violated applicable federal statutory prohibitions on forced labor by, among other things, abusing the TN Visa program in order to coerce plaintiffs to provide menial physical labor.

---

[*] The Honorable Jennifer Choe-Groves, Judge for the United States Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

For purposes of their summary judgment motion, defendants conceded that all plaintiffs believed that their ability to remain lawfully in the U.S. depended on their continued employment at Funk Dairy. The panel concluded that in light of that concession and its obligation, on review of a grant of summary judgment to defendants, to construe the evidence in the light most favorable to plaintiffs, a reasonable jury could find that Funk Dairy knowingly obtained plaintiffs' labor by abusing the TN Visa process in order to exert pressure on plaintiffs to provide labor that was substantially different from what had been represented to them and to federal consular officials. The panel held that, so construed, Funk Dairy's conduct violated the provisions of Chapter 77 of Title 18 of the U.S. Code that prohibit forced labor and trafficking of persons into forced labor. Plaintiffs therefore asserted triable causes of action under the civil suit provision of Chapter 77, 18 U.S.C. § 1595(a).

Because the panel held that the district court erred in dismissing plaintiffs' federal claims, the panel also reversed the district court's decision to decline supplemental jurisdiction over plaintiffs' claims under Idaho state law.

## COUNSEL

Edgar Iván Aguilasocho (argued) and Mario Martinez, Martinez Aguilasocho Law Inc., Bakersfield, California; Natalie Camacho Mendoza, Camacho Mendoza Law, Boise, Idaho; for Plaintiffs-Appellants.

David P. Claiborne (argued) and Katie L. Vendenberg, Sawtooth Law Offices PLLC, Boise, Idaho, for Defendants-Appellees.

Stuart A. Raphael, Hunton Andrews Kurth LLP, Washington, D.C.; Sarah L. Bessell, Human Trafficking Legal Center, Washington, D.C.; for Amicus Curiae Human Trafficking Legal Center.

Melia Amal Bouhabib and Elizabeth Leiserson, Texas RioGrande Legal Aid Inc., Nashville, Tennessee, for Amicus Curiae Aurora Bedolla.

**OPINION**

COLLINS, Circuit Judge:

Plaintiffs are six citizens of Mexico who were recruited to work as "Animal Scientists" at Defendant Funk Dairy, Inc. ("Funk Dairy") in Idaho under the "TN Visa" program for "professional" employees, established under the North American Free Trade Agreement ("NAFTA"). But when Plaintiffs arrived at the dairy to perform such professional services, they were instead required to work substantially as general laborers. After leaving Funk Dairy's employ, Plaintiffs brought this suit alleging a variety of claims under federal and Idaho law. In particular, Plaintiffs alleged that Defendants' bait-and-switch tactics violated applicable federal statutory prohibitions on forced labor by, *inter alia*, abusing the TN Visa program in order to coerce Plaintiffs to provide menial physical labor. The district court, however, granted summary judgment to Defendants on the federal claims and declined to retain supplemental jurisdiction over the state law claims.

For purposes of their summary judgment motion, Defendants expressly conceded that all Plaintiffs believed that their ability to remain lawfully in the U.S. depended on

their continued employment at Funk Dairy. In light of that concession and our obligation to construe the evidence in the light most favorable to Plaintiffs, we conclude that a reasonable jury could find that Funk Dairy knowingly obtained Plaintiffs' labor by abusing the TN Visa process in order to exert pressure on Plaintiffs to provide labor that was substantially different from what had been represented to them and to federal consular officials. So construed, Funk Dairy's conduct violated the provisions of Chapter 77 of Title 18 of the U.S. Code that prohibit forced labor and trafficking of persons into forced labor. *See* 18 U.S.C. §§ 1589(a)(3), 1590(a). Plaintiffs therefore asserted triable causes of action under the civil suit provision of Chapter 77. *See* 18 U.S.C. § 1595(a).

Because the district court erred in dismissing Plaintiffs' federal claims, we also reverse its decision to decline supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3).

Accordingly, we reverse the district court's judgment and remand the case.

# I

Because we are reviewing a grant of summary judgment for Defendants, we recount the facts of this case in the light most favorable to Plaintiffs. *See Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019).

# A

Defendant Funk Dairy, which is owned by Defendant David Funk and his wife, is a dairy operation near the town of Murtaugh in Twin Falls County, Idaho. The dairy's principal business is producing and selling raw milk, and its

operations are managed by the Funks' son-in-law, Defendant Curtis Giles.  The Funks also own and operate a separate entity, Defendant Shoesole Farms, Inc., which has farmland nearby.  Funk Dairy buys feed from Shoesole Farms, Inc., and in return, it supplies the farm with manure to use as fertilizer.  Giles, however, is not involved with the management of Shoesole Farm, Inc.

In April 2013, U.S. Immigration and Customs Enforcement ("ICE") completed an audit of Funk Dairy and concluded that 78 percent of its employees were aliens who lacked sufficient documentation to confirm their eligibility to work in the U.S.  In 2014, in order to address "labor issues" in Idaho and to recruit and retain employees, Giles inquired about the "TN Visa" program that he had heard about while attending conferences.  To set the subsequent events concerning Funk Dairy's use of the TN Visa program in context, we first briefly recount the basic contours of that program.

## B

The TN Visa program, established "pursuant to the provisions of Section D of Annex 1603" of NAFTA, allows a citizen of Mexico or Canada to be admitted to the United States for the purpose of "engag[ing] in business activities at a professional level as provided for in such Annex."  *See* 8 U.S.C. § 1184(e)(2).[1]  The referenced Section D states that

---

[1] In early 2020, Congress amended the relevant statutory language to reflect the adoption of a new trade agreement superseding NAFTA. *See* United States–Mexico–Canada Agreement Implementation Act, Pub. L. No. 116-113, § 503(c), 134 Stat. 11, 71 (2020).  Unless otherwise noted, all references to the applicable statutes and regulations are to the versions in effect at the time of the underlying events in this case in 2015–2016.

the program only applies to a "profession set out in Appendix 1603.D.1," *see* NAFTA, Annex 1603.D.1, December 17, 1992, 32 I.L.M. 612, 666, and that Appendix lists dozens of different professions, *see* NAFTA, Appendix 1603.D.1, 32 I.L.M. at 668–70.   The work must be performed for "a United States entity," which may include an "individual," *see* 8 C.F.R. § 214.6(b), but that entity need not be the formal "employer" of the visa holder, *see id*. § 214.6(d)(3)(ii), (h)(1).  A person granted a TN Visa may be admitted "for a period not to exceed three years."  *Id*. § 214.6(e).  The visa may be extended for additional periods of up to three years upon application of the "United States employer" of the beneficiary or, in the case of a foreign employer, the "United States entity" for which the work is performed.  *Id*. § 214.6(h)(1).  So long as the alien remains qualified for a TN Visa and "continues to be engaged in TN business activities for a U.S. employer or entity at a professional level," there "is no specific limit" on the number of extensions that may be granted.   *Id*. § 214.6(h)(1)(iv).

A Mexican citizen must apply for the TN Visa "at a United States consular office" and "must present documentation sufficient to satisfy the consular officer . . . [1] that the applicant is seeking entry to the United States to engage in business activities for a United States employer[] or entity[] at a professional level, and [2] that the applicant meets the criteria to perform at such a professional level." 8 C.F.R. § 214.6(d)(3).  The proof "may be in the form of a letter from the prospective employer[] in the United States, and must be supported by diplomas, degrees or membership in a professional organization."  *Id*. § 214.6(d)(3)(ii).  The documentation must also address and "fully affirm" the following five points:

> (1) the qualifying "profession" from the list in Appendix 1603.D.1;
>
> (2) a "description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in [*sic*] for the United States employer/entity";
>
> (3) the "anticipated length of stay";
>
> (4) the "educational qualifications or appropriate credentials" demonstrating that the alien "has professional level status"; and
>
> (5) the "arrangements for remuneration for services to be rendered."

*Id*. § 214.6(d)(3)(ii)(A)–(E).

After acquiring a TN Visa and coming to the United States, a TN Visa holder is allowed to seek to change employers if the worker finds a new employer eligible to sponsor him or her. *See* 8 C.F.R. § 214.6(i). An employer is not required to notify the Government when a worker with a TN Visa ends his or her employment. *See* U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 402.17-5(A)(8) (2017 ed.) ("There is no requirement that the TN employer or worker notify the [Government] of the termination of the employment relationship.").

**C**

**1**

In the fall of 2014, Giles traveled to Mexico with the intention of recruiting workers for Funk Dairy who would qualify for visas under the TN Visa program. There, he recruited Plaintiffs César Martínez-Rodríguez ("Martínez"), Dalia Padilla-López ("Padilla"), Mayra Múñoz-Lara ("Múñoz"), Brenda Gastélum-Sierra ("Gastélum"), Leslie Ortiz-García ("Ortiz"), and Ricardo Neri-Camacho ("Neri"), who are all citizens of Mexico, to work for Funk Dairy. All of the Plaintiffs had completed four-year college degrees and were licensed to work in Mexico as either animal scientists or veterinarians.

Giles gave presentations at several different Mexican universities, describing employment opportunities at Funk Dairy. Although the presentations were nominally open to anyone interested in attending, Giles made clear that he was only interested in applicants who had already graduated and been licensed in veterinary medicine or animal science. Thus, for example, at the presentation Neri attended, there were initially 80 to 100 attendees, but most of them left early after they heard that Giles was only looking for veterinary doctors who had already graduated and had a license.

After attending one of these presentations, each Plaintiff was interviewed by Giles. During these interviews, Giles avoided providing specifics about the type of work that Plaintiffs would perform if they were hired by Funk Dairy. For example, when interviewing Gastélum, Giles "evaded [questions] regarding the activities of the job, the job duties and the details." Giles told Gastélum they "would talk about that later," after she arrived in Idaho. Giles similarly told

Ortiz that they would discuss the specific tasks of her job after she was selected.

Despite Giles' evasive answers regarding the specific job duties, Plaintiffs developed, over the course of the hiring process, a general sense of what they thought the job would entail.  Neri understood that the job would be "to supervise the quality of the milk, check on or supervise the workers and the machinery, the quality of the feed, and the care of the animals."  Padilla understood that the job would involve "checking the quality of the milk and the milking, not be a milker."  Gastélum, Ortiz, Múñoz, and Martínez however, did not testify as to any clear understanding of what duties would be expected, other than that the position was to be an "Animal Scientist."   Giles also described the general operations of the dairy and informed Plaintiffs that the work would include "practical, hands-on experience with dairy animals," but he did not suggest that it would be physically demanding.

Plaintiffs also left the presentations and interviews with a general understanding of the amount of work, compensation, and other benefits that came with the jobs. Plaintiffs' recollections varied somewhat, but they generally understood that each of them would work 130 to 144 hours in two-week pay periods, receive at least $10 per hour with the opportunity for raises, and receive a $2,000 bonus and six days of paid vacation after one year.  Plaintiffs also believed, again with varying recollections, that some of their housing and their transportation costs would be covered by Funk Dairy.

Each Plaintiff received a job offer, and each Plaintiff accepted.  After Plaintiffs accepted the positions, Giles arranged for legal counsel to assist them in securing TN Visas.  Among the dozens of professions that are eligible for

TN Visas under NAFTA is "Animal Scientist." *See* NAFTA, Appendix 1603.D.1, 32 I.L.M. at 669; *see also* 8 C.F.R. § 214.6(c). To qualify for admission as an animal scientist, the alien must have at least a "Baccalaureate or Licenciatura Degree," *see* NAFTA, Appendix 1603.D.1, 32 I.L.M. at 669; *see also* 8 C.F.R. § 214.6(b), (c). To obtain the TN Visas, Plaintiffs needed to submit applications to the U.S. Department of State for entry as animal scientists.

Funk Dairy's agents prepared the applications for Plaintiffs and provided supporting letters to the U.S. Embassy in Mexico. Each letter stated that the respective Plaintiff would be employed by Funk Dairy "in the professional-level position of animal scientist for a three-year period commencing in October 2014 at an annual salary of at least $25,000." The letters described the specific tasks that Plaintiffs would be expected to perform and stated that, "[d]ue to the sophisticated, professional nature of the above duties, the person filling this position must hold at minimum a Bachelor's degree in Agricultural Science, Dairy Science, Veterinary Medicine, or a closely related field."

U.S. consular officials also interviewed each Plaintiff in Mexico. Funk Dairy's legal counsel prepared Plaintiffs for the interviews, and specifically instructed at least one of them (Padilla) to tell U.S. consular officials that she would *not* be milking cows at Funk Dairy. Ultimately, each Plaintiff obtained a TN Visa authorizing entry into the U.S. for professional employment with Funk Dairy as an animal scientist.

All of the Plaintiffs understood that their employment was "at-will." Defendants stipulated for purposes of summary judgment that all Plaintiffs understood that "if their

employment with Funk Dairy ended, their Visa would expire and they would be subject to removal back to Mexico."[2]

## 2

Upon arrival at Funk Dairy between November and December 2014, Plaintiffs learned that the activities listed in Funk Dairy's supporting letters to the U.S. Embassy constituted only a portion of their responsibilities. Thus, although Plaintiffs performed at least some of the "Animal Scientist" activities listed in those letters, Plaintiffs were also required to perform varying amounts of unskilled, nonprofessional labor that was not materially different from the work done by the dairy's general laborers. On at least one occasion, Ortiz directly complained to Giles that her work did not amount to animal science. In fact, Funk Dairy's employment records listed each Plaintiff's position as "Milker," "Outside Help," or simply "Calves." And in a worker's compensation injury report, Padilla's occupation was listed as "General Dairy Worker."

Plaintiffs received compensation resembling what Giles had described, but in several other respects the terms were not as expected. Neri never received his $2,000 bonus or six

---

[2] Thus, for example, Gastélum testified that she thought "we couldn't leave our job[s] because [Giles] would return us to Mexico." Padilla and Muñoz thought that if their employment at Funk Dairy ended, they would be required to return to Mexico. Ortiz understood that Funk Dairy had the power to have her deported. And Martínez thought that if his employment ended, his visa would expire. Although Neri testified at his deposition that he was *not* aware that he "would have had to go back to Mexico" if his employment ended, we accept for purposes of this appeal Defendants' factual concession that Neri, like the other Plaintiffs, also believed that his visa status and ability to stay in the U.S. were tied to his employment at Funk Dairy.

paid days of vacation. Gastélum, Múñoz, Padilla, and Ortiz were shorted vacation pay in varying amounts.

Funk Dairy also did not cover transportation and housing expenses as Plaintiffs had expected. For example, Funk Dairy initially paid for Martínez's airfare to fly to Idaho but, contrary to Giles's representations, the cost of that airfare was deducted from Martínez's paycheck. Each Plaintiff ultimately had to find his or her own transportation to and from work. Upon Plaintiffs' arrival, Funk Dairy had housing ready near the dairy, and at least five Plaintiffs received one or more free months of housing.[3] After the first one or two months, Funk Dairy began to require Plaintiffs to pay rent. Martínez's housing was in a basement that lacked heating and was infested with mice and spiders. Giles also did not allow the four female Plaintiffs (Gastélum, Múñoz, Ortiz, and Padilla), who initially lived together in a house owned by Funk Dairy, to have visitors, and Giles had someone watch their house to ensure that this rule was followed. Ultimately, only Padilla stayed in that house—Gastélum, Ortiz, and Múñoz found different housing.

Giles, who oversaw Plaintiffs and their working conditions, was often unwilling to accommodate Plaintiffs' health needs or provide appropriate medical care for workplace injuries. Although Giles knew that Neri had diabetes, Neri was not allowed consistent breaks or a regularly scheduled lunch. Although some Plaintiffs had been told that they would have the *option* to work up to 12 hours per day, six days a week, the reality was that 12-hour shifts, six days a week were mandatory, and some Plaintiffs stated that Giles regularly denied rest, meal, and bathroom breaks. At times, workers at the dairy used a

---

[3] Martínez could not remember whether he paid rent his first month.

bucket to relieve themselves due to the lack of facilities in parts of the farm. When Padilla fractured her finger at work, Giles refused to change her work schedule or allow her a day off, telling her that she "had nine other fingers." When a hydraulic bar in the milking parlor cut off part of Múñoz's finger, Giles delayed Múñoz from reaching an emergency room by instructing the on-duty employee en route with her to a hospital to return to the dairy to collect the severed portion, take her to a cheaper hospital, and switch drivers to an off-duty employee. The resulting delay prevented Múñoz from having the severed portion reattached.

Giles made numerous references to deportation throughout Plaintiffs' employment. He specifically told at least three Plaintiffs (Gastélum, Ortiz, and Múñoz) that if their employment with Funk Dairy ended for any reason, they would be deported or otherwise required to leave the U.S. He also told several Plaintiffs that they would be returned to Mexico if they discussed their rate of pay with other dairy workers, and he expressly threatened Ortiz with deportation when she complained to him that her work at Funk Dairy did not amount to "animal science."

Funk Dairy and Giles did not restrict Plaintiffs' ability to travel. All Plaintiffs obtained Idaho driver's licenses and motor vehicles for personal transportation, and neither Funk Dairy nor Giles interfered with their vehicle use or driver's licenses. Each Plaintiff also had a passport, and several even made trips to Mexico and California. But Funk Dairy sometimes refused to grant requests for time off.

Funk Dairy and Giles generally did not censor or control Plaintiffs' phone and email communications with others. But some Plaintiffs said that they were unable to communicate electronically when they first arrived because the housing provided by the dairy did not have a phone or

computer, and Plaintiffs initially lacked the financial means to get phones.

After around a year of employment, Martínez, Ortiz, and Gastélum were "released" because they did not "meet[] [Funk Dairy's] expectations." Neri quit after eight months of employment, and Padilla and Múñoz each quit a little after a year of employment. Neri quit because of health problems related to his diabetes and because he "didn't feel the activities [he was] doing were related to animal science." Padilla quit because she had to return to Mexico to take care of her ill mother. Múñoz quit because she had a lot of pain in the finger that had been injured and "could no longer continue to work under those climate conditions or the work conditions." Plaintiffs complained to ICE about their treatment at Funk Dairy, and ICE undertook an investigation into whether Funk Dairy had abused the TN Visa program. The investigation did not result in any further action by ICE.

## D

In January 2017, Plaintiffs filed their original complaint, alleging claims under federal and Idaho law.[4] In their operative first amended complaint, Plaintiffs assert two claims under 18 U.S.C. § 1595(a), which creates a civil cause of action for victims of violations of the various prohibitions on forced labor contained in Chapter 77 of Title 18 of the U.S. Code. First, Plaintiffs alleged that Defendants obtained their labor in violation of the prohibition on forced labor in 18 U.S.C. § 1589. Second, Plaintiffs alleged that Defendants violated 18 U.S.C. § 1590 by trafficking them

---

[4] Plaintiffs asserted jurisdiction based solely on the federal-question-jurisdiction statute, *see* 28 U.S.C. § 1331, and did not invoke the district court's diversity jurisdiction under 28 U.S.C. § 1332.

into the U.S. for forced labor.  Plaintiffs also asserted six claims under Idaho law—namely, intentional fraud, concealment, false promise, negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing.

The district court granted summary judgment to Defendants on Plaintiffs' two federal claims, concluding that Plaintiffs had failed to present sufficient evidence to establish that Defendants had violated either § 1589 or § 1590.  After disposing of the federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3).  Having thus dismissed all of Plaintiffs' claims, the district court did not consider Defendants' alternative argument that, if any claims survived, Funk Dairy was the only proper defendant.  Plaintiffs timely appealed.

## II

Section 1595(a) of Title 18 authorizes any "individual who is a victim of a violation of this chapter"—*i.e.*, Chapter 77 of Title 18—to "bring a civil action" seeking "damages and reasonable attorneys fees" from "the perpetrator," as well as from others who benefitted in specified ways from the violation.

As noted earlier, Plaintiffs here alleged two violations of Chapter 77: (1) forced labor in violation of § 1589(a); and (2) trafficking a person into forced labor in violation of § 1590(a).  By its terms, the trafficking statute invoked in Plaintiffs' second cause of action requires proof that the perpetrator "knowingly recruit[ed], harbor[ed], transport[ed], provide[d], or obtain[ed] by any means, any person for labor or services *in violation of this chapter*."  18 U.S.C. § 1590(a) (emphasis added).  Here, the predicate

"violation of this chapter" on which Plaintiffs' trafficking claim is based is the same forced-labor violation alleged in the first cause of action.  Moreover, Defendants' sole argument in support of affirming the summary judgment on the trafficking claim is that Plaintiffs have not adequately established a predicate violation of § 1589(a)'s prohibition on forced labor.  Accordingly, the viability of both of Plaintiffs' federal causes of action rests dispositively on whether Plaintiffs have presented sufficient evidence to establish all of the elements of a violation of § 1589(a).

In addressing that question, we begin with the text of the statute.  Section 1589(a) imposes criminal punishment on:

> [w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Establishing the statute's *actus reus* thus requires proof that the defendant "provide[d] or obtain[ed] the labor or services of a person" by one or more of the four enumerated means. *Id*. In addition, it must be proved that the defendant acted with the requisite *mens rea*—*i.e.*, "knowingly." *Id*.; *see also United States v. Dann*, 652 F.3d 1160, 1169–70 (9th Cir. 2011) (analyzing the elements of a charge under § 1589(a)(4)).

The district court concluded that Plaintiffs failed to present sufficient evidence to raise a genuine dispute of material fact as to either the *actus reus* or *mens rea* requirements of § 1589(a). *See Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017) ("Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."). Reviewing de novo, *see id.*, we disagree as to both requirements.[5]

## III

In contending that they have satisfied § 1589(a)'s *actus reus* requirement, Plaintiffs rely on three of the four statutorily enumerated means of committing forced labor— namely, those set forth in paragraphs (2), (3), and (4) of that

---

[5] Because the district court concluded that Plaintiffs had wholly failed to present sufficient evidence of a violation of § 1589(a), it declined to resolve Defendants' fallback argument that summary judgment should at least have been granted to some of the separate Defendants. Because we conclude that Plaintiffs presented sufficient evidence that Funk Dairy violated § 1589(a), we reverse the district court's broader ruling and leave it to that court to address on remand, in light of our ruling, whether to grant summary judgment to the other separate Defendants. *See infra* note 13.

subsection.  Because Plaintiffs pleaded only a single forced-labor cause of action in their operative complaint, the district court's dismissal of that claim was erroneous if Plaintiffs presented sufficient evidence to establish that Defendants engaged in any *one* of these three means with the requisite *mens rea*.  We conclude that the evidence in the summary judgment record would permit a reasonable jury to find that Funk Dairy knowingly "obtain[ed] the labor" of Plaintiffs through the particular means enumerated in § 1589(a)(3), namely, abuse of law or legal process.[6]    18 U.S.C. § 1589(a)(3).

The *actus reus* requirement of § 1589(a)(3) can be met by showing that the defendant "provide[d] or obtain[ed] the labor or services of a person . . . by means of the abuse or threatened abuse of law or legal process."   18 U.S.C. § 1589(a)(3).   Section 1589(c) defines the crucial phrase "abuse or threatened abuse of law or legal process" to mean:

> the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(c)(1).  In the context of the claims alleged here, the language of § 1589(a)(3), coupled with this definition, requires each Plaintiff to prove three elements: (1) that Funk Dairy used a law or legal process in a manner

---

[6] As discussed below, we leave it to the district court on remand to reconsider, in light of our decision, whether Plaintiffs' alternative reliance on § 1589(a)(2) and (a)(4) is also viable. *See infra* note 13.

or for a purpose for which it was not designed; (2) that Funk Dairy did so "in order to exert pressure" on the Plaintiff to cause him or her to provide labor; and (3) that Funk Dairy obtained the Plaintiff's labor "by means of" the pressure created by that abuse—*i.e.*, that the resulting pressure *caused* the Plaintiff to provide the labor that Funk Dairy obtained.[7] *See, e.g.*, *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179–80 (9th Cir. 2012). Plaintiffs have presented sufficient evidence to allow a reasonable jury to find all three elements.

## A

Defendants do not contest that the TN Visa program qualifies as a "law or legal process" for purposes of § 1589. Instead, the central question concerning the first element is whether, in obtaining Plaintiffs' employment through that program, Funk Dairy used the TN Visa program in a "manner" and "for [a] purpose for which [it] was not designed." 18 U.S.C. § 1589(c)(1).

## 1

In addressing this issue, we must first identify what does and does not count as an objective for which the TN Visa program was designed.

A defining feature of that program, as reflected in the text of NAFTA and the implementing statute, is the

---

[7] Plaintiffs' operative complaint makes clear that the relevant "action" that Plaintiffs were caused to take by Defendants' alleged exertion of pressure was the provision of their labor. The complaint likewise makes clear that Plaintiffs rely on the theory that Defendants actually "abuse[d]" a law or legal process, rather than that they "threatened" to do so.

temporary admission of Mexican or Canadian nationals "to engage in business activities *at a professional level*." 8 U.S.C. § 1184(e)(2) (emphasis added); *see also* NAFTA, Annex 1603.D.1, 32 I.L.M. at 666 (similar). Given this evident "design[]" of the TN Visa program, Plaintiffs may properly establish the requisite abuse of that program by showing that Funk Dairy sponsored Plaintiffs' applications in order to obtain labor that was *not* at a "professional level."

But we cannot similarly say that the "design[]" of the TN Visa program extends to all aspects of employment beyond this fundamental distinction between professional and nonprofessional labor. Apart from that key limitation, the TN Visa program itself generally does not purport to specify, or to regulate, the substantive terms of employment of such admitted professionals. As a result, the mere fact that a sponsoring employer later breaches its employment agreement with a TN Visa holder would not, standing alone, be sufficient to establish that the employer has thereby used that visa program in a manner or for a purpose for which it was not designed. A forced labor claim requires more than a "bad employer-employee relationship[]." *Dann*, 652 F.3d at 1170. Accordingly, without more, the contention that Funk Dairy did not provide all of the employment benefits that Plaintiffs were promised—such as free transportation, free housing, or specified vacation time—does not itself provide a basis for concluding that Funk Dairy abused the TN Visa process.[8]

---

[8] Defendants' failures to provide such promised benefits might be relevant to the scope of damages available for a violation of § 1589(a)(3), as well as to one or more of Plaintiffs' state law claims. We have not been presented with any such issues and do not decide them.

We therefore focus on whether Plaintiffs adequately supported their contention that Funk Dairy used the TN Visa program to obtain labor from them that did not qualify as "business activities at a professional level." 8 U.S.C. § 1184(e)(2). Specifically, Plaintiffs allege that, after representing to them and to U.S. consular officials that Plaintiffs were being hired to perform the "professional activities" of an "Animal Scientist," 8 C.F.R. § 214.6(c), (d)(3)(ii)(B), Funk Dairy required Plaintiffs, upon arrival in Idaho, to work substantially as general laborers. Plaintiffs presented sufficient evidence to support this contention.

**2**

As explained earlier, the applicable regulations require a TN Visa applicant to provide "documentation," typically "in the form of a letter from the prospective employer(s) in the United States," affirming five specified matters: (1) the qualifying "profession of the applicant" from the list in the relevant NAFTA Appendix; (2) a "description of the professional activities" that the applicant would be performing, "including a brief summary of daily job duties, if appropriate"; (3) the "anticipated length of stay"; (4) the applicant's "professional level status," as shown by his or her "educational qualifications" or other "appropriate credentials"; and (5) the "arrangements for remuneration." 8 C.F.R. § 214.6(d)(3)(ii)(A)–(E); *see also supra* at 7–8. To fulfill this requirement, Funk Dairy's agents submitted almost identically worded letters, signed by Giles, in support of each Plaintiff's application.

In discussing the first of the five required elements, Funk Dairy's letters stated that the dairy "wish[ed] to employ [Plaintiffs] in the professional-level position of Animal Scientist," which is one of the qualifying professions listed in the relevant NAFTA Appendix. Addressing the second

element ("professional activities"), the letters asserted that Plaintiffs would "help develop, implement, and oversee effective animal reproduction, nutrition, animal health, and related dairy industry programs relating to effective herd management." The letters further elaborated on the tasks Plaintiffs would perform as follows:

> Applying advanced theoretical and practical knowledge and skills in the field of animal science, [Plaintiffs] will be responsible for performing artificial insemination, sick/pregnant cow treatment, fresh cow monitoring, calving, colostrum handling, feed evaluation/preparation, and related professional duties including monitoring milk cleanliness/ concentration, and monitoring the transfer of antibodies in calf blood.

With respect to Plaintiffs' professional qualifications for these tasks (the fourth element), the letters stated:

> Due to the sophisticated, professional nature of the above duties, the person filling this position must hold at minimum a Bachelor's degree in Agricultural Science, Dairy Science, Veterinary Medicine, or a closely related field (please note that English language fluency is not required given the specific nature of the above duties and because the animal scientist will report to bilingual supervisory personnel on-site).

The letters concluded by stating that Funk Dairy "hereby guarantee[s] that we will comply with all terms of

[Plaintiffs'] TN status for the duration of [their] employment with us."**9**

Plaintiffs' testimony likewise supports the conclusion that, during the recruiting process, Funk Dairy represented that the "Animal Scientist" jobs being offered would qualify for the TN Visa program for professionals. Plaintiffs testified that as a result of the initial on-campus presentations, their job interviews, and the visa application process, they understood that Funk Dairy was hiring "Animal Scientists," even though Giles was vague on the details on what that meant. *See supra* at 9–10. Moreover, to the extent that some of the Plaintiffs developed a more specific understanding of what the animal scientist position entailed, it was affirmatively inconsistent with the view that they were being hired to perform general labor. For example, Neri testified that his understanding was that the job "was to supervise the quality of the milk, check on or supervise the workers and the machinery, the quality of the feed, and the care of the animals." Padilla testified that she left her initial interview "under the impression that [the job] was going to be checking the quality of the milk and the milking, not be a milker." With other Plaintiffs, such as Gastélum and Ortiz, Giles actively evaded supplying details about what an "Animal Scientist" would do at Funk Dairy. That evasion, too, supports a reasonable inference that Funk Dairy's actions created a misleading impression that the contemplated work would involve—as the letter to the

---

**9** The letters addressed the third and fifth elements by stating that Plaintiffs' annual salary would be "at least $25,000" and that the anticipated length of stay was a "three-year period." Plaintiffs have not contended in this court that these representations were inaccurate.

Embassy put it—"duties" of a "sophisticated, professional nature."

Plaintiffs also testified that Funk Dairy's agents, in helping to prepare Plaintiffs for their interviews with U.S. consular officials, told Plaintiffs to describe the jobs in terms that matched how Funk Dairy had characterized them in the letters to the Embassy. For example, Padilla testified that Funk Dairy's agents instructed her to say that Plaintiffs were being hired "as animal scientists in the reproduction area, nutrition, and animal health." She was specifically instructed to tell the consular officials that she would not "be milking." During Padilla's interview, the consular officials asked her what work she would be doing for Funk Dairy, and Padilla answered, "animal scientist," just as Funk Dairy had instructed.

Plaintiffs also presented sufficient evidence to permit a rational jury to find that the job that Plaintiffs were *actually* asked to perform upon their arrival in Idaho could not fairly be described as that of an "Animal Scientist." For example, in Funk Dairy's own internal employment records, Plaintiffs' occupations were all listed as "Milker" (Martínez, Padilla, and Múñoz), "Outside Help" (Ortiz and Neri), or "Calves" (Gastélum). In a worker's compensation report that was completed when Padilla was injured on the job, her occupation was listed as "General Dairy Worker."

Furthermore, Plaintiffs all testified about the substantial volume of general labor that they were required to perform. Ortiz described her job duties as lifting, moving, and feeding baby cows, folding towels, cleaning equipment, connecting milking hoses, transporting cows, picking up trash, washing feeding basins, and removing feces. Múñoz stated that her duties included milking cows, cleaning bottles, feeding cows, and otherwise helping the milkers to milk. Martínez

testified that his job duties included transporting cows, feeding calves, cleaning the feeding area, removing manure with a shovel, and cleaning the water basins. Neri said that his tasks included keeping animal areas clean, cleaning the water basins, feeding calves, and removing feces. Padilla testified that her duties included cleaning equipment, attaching milking machines, and distributing milk to calves. In other words, Padilla was assigned to "the actual task of a milker"—despite having been specifically instructed by Funk Dairy's agents to tell U.S. consular officials that she would *not* be a milker. And although Gastélum's testimony was somewhat vague on this subject, she stated that she was required to spend several hours per week transporting calves with a truck and trailer, that she spent several hours each day performing miscellaneous additional activities, and that the work was "much more physical" than what animal science entailed.

Defendants note that each Plaintiff also acknowledged performing some of the tasks of an "Animal Scientist" as described in the letters to the Embassy, such as artificial insemination, administering vaccines, and collecting blood samples. But the fact that Plaintiffs performed *some* such tasks would not preclude a reasonable jury from nonetheless concluding that, viewing Plaintiffs' work duties as a whole, Plaintiffs were employed substantially as general laborers and that the "Animal Scientist" tasks constituted a limited portion of their duties.

Given the evidence of a sharp disparity between the "sophisticated, professional" tasks that Funk Dairy described during the TN Visa process and the general labor Funk Dairy subsequently demanded of Plaintiffs, a reasonable jury could find that Funk Dairy used the TN Visa

program "in [a] manner" and "for [a] purpose for which [it] was not designed." 18 U.S.C. § 1589(c)(1).

## B

Plaintiffs also presented sufficient evidence to allow a rational jury to conclude that Funk Dairy abused the TN Visa program "in order to exert pressure" on Plaintiffs "to cause" them to provide labor *different* from what they had agreed to provide. 18 U.S.C. § 1589(c)(1). In particular, three categories of evidence in the record would support such a finding.

First, Funk Dairy's abuse of the TN Visa program placed Plaintiffs in a bait-and-switch situation in which Plaintiffs journeyed from Mexico to Idaho with one set of work expectations, only to be required upon arrival to perform a substantial volume of menial work. As a practical matter, the resulting situation would be expected to, and did, exert substantial pressure on Plaintiffs to go along with providing labor that was very different from what they had agreed and expected to perform. Given the record evidence showing that Giles evaded supplying any specifics about job tasks and that he helped to foster a belief that the work would be professional in nature, a reasonable jury could find that Funk Dairy acted "in order to exert" that "pressure." 18 U.S.C. § 1589(c)(1). That is, the jury could find that the inherently coercive pressure of Funk Dairy's bait-and-switch was *intended* rather than incidental.

Second, Giles made statements to each Plaintiff that fostered a belief that, if the Plaintiffs did not go along with what Funk Dairy wanted—which would include its bait-and-switch—they would be sent back to Mexico. For example, Giles told multiple Plaintiffs that if they discussed their pay

with their coworkers, they would have to return to Mexico.[10] On one occasion when Ortiz missed a day of work, Giles told her "[she] should thank God that [Giles] didn't deport [her] without [her] belongings, just like that." On another occasion, when Ortiz expressed disappointment that the work that she was doing did not amount to animal science, Giles mentioned deportation. Gastélum, Ortiz, and Múñoz testified that Giles repeatedly said that if their employment ended with the dairy farm, he would return them to Mexico or they would be deported. Indeed, Giles explicitly told Múñoz that, if her employment ended with Funk Dairy, he would be required to report that fact to the United States Government. Padilla similarly believed that if she left her employment with Funk Dairy, the dairy would have to report that to the Government. Although only Ortiz mentioned hearing a comment that specifically linked deportation to complaints that the work demanded was not "animal science," that is not dispositive. A jury could reasonably conclude that, when Funk Dairy threatened deportation to ensure compliance with one of its demands, Funk Dairy thereby reinforced the same understanding in Plaintiffs with respect to its *other* demands—including its demand for non-animal-science general labor.

Third, some of Giles's deportation-related statements did not accurately describe the law or the TN Visa program's requirements. The relevant regulations expressly allow the holder of a TN Visa, while in the U.S., to apply to change employers if the visa holder finds a new employer to sponsor him or her. *See* 8 C.F.R. § 214.6(i). Furthermore, an employer is *not* required to notify DHS when a worker with

---

[10] Plaintiffs' pay was generally higher than many of the other numerous Funk Dairy employees that were, like Plaintiffs, classified as "Milker," "Outside Help," or "Calves."

a TN Visa ends his or her employment, despite Giles's suggestion to the contrary.[11]   *See* U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 402.17-5(A)(8) ("There is no requirement that the TN employer or worker notify the Department of the termination of the employment relationship.").   Giles made statements to some of the Plaintiffs that erroneously suggested that the opposite was true.   By fostering *false* beliefs about the immigration consequences of failing to comply with what Funk Dairy wanted, Giles exacerbated the pressure to go along with the bait-and-switch inherent in Funk Dairy's abuse of the TN Visa program.

Taken together, this evidence supports a reasonable inference that Funk Dairy acted so as to exert pressure on Plaintiffs to cause them to acquiesce in supplying the nonprofessional labor that Funk Dairy demanded upon their arrival.[12]

---

[11] Defendants argue that they had a duty under 8 U.S.C. § 1324(a)(1)(A) to report any change in Plaintiffs' employment status, but that is wrong.  Given that the regulations explicitly allow TN Visa holders to apply in the U.S. to work at other employers and given that the State Department expressly disavows any employer obligation to report a termination of a TN Visa holder, an employer who fires a TN Visa holder does not thereby cause that person to acquire an immediate unlawful status, nor does that employer thereby harbor or conceal the alien.

[12] Because the relevant violation of § 1989(a) at issue here is obtaining labor by means of the abuse of law or legal process, *see* 18 U.S.C. § 1589(a)(3), it is irrelevant whether the individual statements that Giles made to the Plaintiffs would *also* qualify as actionable "threats of serious harm" under § 1589(a)(2).  *Cf. Headley*, 687 F.3d at 1179–80 (addressing claim based on alleged threats of "serious harm" in violation of § 1589(a)(2) and an alleged scheme to cause the plaintiffs to believe

## C

We also conclude that the record would support a reasonable inference that Funk Dairy obtained the nonprofessional labor that Plaintiffs were tasked with performing "by means of" the pressure created by Funk Dairy's abuse of the TN Visa program.          18 U.S.C. § 1589(a)(3).

As we have recognized, the phrase "by means of" refers to familiar principles of causation and requires a proximate causal link between one or more of the unlawful means enumerated in § 1589(a) and the labor actually obtained. *Headley*, 687 F.3d at 1179–80.          In *Headley*, where the alleged violation rested on threats of "serious harm," and an alleged scheme to cause the plaintiffs to fear "serious harm" if they did not perform the labor, *see id*. at 1178–79 (citing § 1589(a)(2), (4)), the causation inquiry necessarily focused on whether the requisite causal link was shown between the "serious harm" feared and the labor that was obtained, *id*. at 1179–80.          And because the definition of "serious harm" requires a showing of a harm "that is sufficiently serious, under all the surrounding circumstances, to *compel* a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm," 18 U.S.C. § 1589(c)(2) (emphasis added), the causation inquiry turned

---

that they would suffer "serious harm" in violation of § 1589(a)(4)); *Dann*, 652 F.3d at 1169 (noting that the Government limited its criminal case to an alleged scheme to cause fear of "serious harm" under § 1589(a)(4) and relying on the distinct definition of "serious harm" contained in § 1589(c)(2)).          As explained below, we leave any such additional issues to be addressed anew by the parties and the district court on remand.  *See infra* note 13.

on whether sufficient evidence of compulsion of labor had been shown. *See* 687 F.3d at 1178–81.

In light of the distinct statutory definition of "abuse . . . of law or legal process," the causation question in this case is whether Funk Dairy's abuse of the TN Visa program "in order to exert pressure" on Plaintiffs to provide nonprofessional labor that was *different* from what Plaintiffs had voluntarily agreed to perform can reasonably be found to have *caused* Plaintiffs to provide that labor. 18 U.S.C. § 1589(c)(1); *see also id*. § 1589(a)(3). We conclude that a reasonable jury could find that the substantial coercive pressures created by Funk Dairy's bait-and-switch abuse of the TN Visa program proximately caused Plaintiffs to provide different, nonprofessional labor instead of the professional work they had agreed to. Indeed, Defendants conceded that all Plaintiffs subjectively believed that, if they were fired by Funk Dairy, they would be required to return to Mexico. *See supra* at 11 & n.2. That fact, coupled with the objectively coercive circumstances discussed above, amply supports an inference that Funk Dairy's misconduct caused Plaintiffs to provide menial labor that was different from the professional animal-science work they had agreed to perform. *Cf. Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019) (holding that the plaintiff, who was required to work overtime without extra pay, stated a claim for violation of § 1589(a)(3) by alleging that the defendant told the plaintiff he "would cancel or withdraw his immigration sponsorship").

Defendants argue that any inference of causation is conclusively refuted by the fact that several Plaintiffs ultimately left employment with Funk Dairy of their own volition. The district court similarly reasoned that "[i]f Funk Dairy was truly forcing Plaintiffs to perform labor, they

would not have allowed three Plaintiffs to quit, nor terminated three Plaintiffs themselves." We reject this flawed reasoning. The fact that Funk Dairy's coercive pressures were not *indefinitely* successful in obtaining the sought-after nonprofessional labor from Plaintiffs would not preclude a jury from reasonably finding that it was *initially* successful for a significant period of time. That partial success is sufficient to establish the requisite causation as to the labor thereby obtained.

Defendants also contend that, given Plaintiffs' ability freely to communicate and to travel, their circumstances did not involve the sort of conditions that are comparable to "modern-day slavery." This argument ignores the breadth of the statutory language of § 1589, which we have previously observed was enacted to abrogate, as a practical matter, the Supreme Court's narrow interpretation of "involuntary servitude" in *United States v. Kozminski*, 487 U.S. 931, 952 (1988) (construing 18 U.S.C. §§ 241, 1584 (1982 ed.)). *See Dann*, 652 F.3d at 1169. The fact that Plaintiffs were not reduced to slave-like peonage does not mean Funk Dairy did not violate the particular prohibition set forth in § 1589(a)(3).

## IV

In addition to satisfying all three elements of the *actus reus* required under § 1589(a)(3), Plaintiffs also presented sufficient evidence to allow a reasonable jury to find that Funk Dairy acted with the requisite *mens rea*.

To demonstrate scienter, the employee must show that the employer "*knowingly* . . . obtain[ed] the labor or services" of the employee "by means of" one of the four statutorily enumerated methods. 18 U.S.C. § 1589(a)(1)–(4) (emphasis added). The scienter element requires proof that

the defendant knew (1) that the enumerated "circumstance existed" and (2) that the defendant was obtaining the labor in question as a result. *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008). That is, the employer must have intended the coercive pressure and its effects on the employee. *Dann*, 652 F.3d at 1170 (stating that the defendant must have "*intended*" to cause the victim to be placed in the enumerated coercive circumstance). We have little difficulty concluding that Plaintiffs presented sufficient evidence of *mens rea* under these standards.

As discussed earlier, the particular elements of the *actus reus* at issue here under § 1589(a)(3) already incorporate an element of scienter inasmuch as "abuse . . . of law or legal process" requires a showing that Funk Dairy abused the TN Visa program "*in order to exert pressure*" on the Plaintiffs to provide the different labor requested. 18 U.S.C. § 1589(c)(1) (emphasis added). Consequently, the same evidence discussed earlier amply supports the conclusion that (1) Funk Dairy *knew* of the coercive pressures that were inherent in its abuse of the TN Visa program and in its references to deportation upon termination; and (2) Funk Dairy intended for Plaintiffs to succumb to those pressures.

Accordingly, Plaintiffs presented sufficient evidence to establish a forced labor claim under § 1589(a)(3). The district court therefore erred in granting summary judgment to Defendants as to Plaintiffs' first cause of action.[13] And

---

[13] As noted earlier, Plaintiffs also sought to defend the sufficiency of their first cause of action on the alternative grounds that Funk Dairy's actions violated § 1589(a)(2) and § 1589(a)(4). To the extent that Plaintiffs on remand elect to continue to rely upon these alternative theories as well, we leave it to the district court to re-evaluate those theories in light of our decision and after receiving the parties' additional input. We likewise leave it to the district court to address in the first

because Defendants have presented no grounds for rejecting Plaintiffs' § 1590(a) trafficking-into-forced labor claim other than their contention that Plaintiffs failed to prove a predicate forced-labor violation of § 1589(a), the district court necessarily erred in granting summary judgment to Defendants on that claim as well.

## V

We reverse the district court's grant of summary judgment to Defendants on Plaintiffs' first and second causes of action. Because the district court erred in dismissing those federal claims, we likewise reverse its decision declining, under 28 U.S.C. § 1367(c)(3), to retain supplemental jurisdiction over Plaintiffs' state law claims.

**REVERSED AND REMANDED.**

---

instance whether Plaintiffs' theory of liability applies equally to each Defendant. The district court declined to definitively decide that issue in light of its (erroneous) ruling that Plaintiffs' federal claims failed as against all Defendants.